IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PROJECT VOTE and MARYELLEN    )
HAYDEN,    )
    )
        Plaintiffs,    )
    )
        v.    )    **Civil Action No. 09-951**
    )    **Judge Nora Barry Fischer**
LINDA L. KELLY, Attorney General,    )
Commonwealth of Pennsylvania,    )
    )
        Defendant.    )

## MEMORANDUM OPINION

## I.    Introduction

This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56. Docket Nos. 70 & 74. For the reasons that follow, the motion for summary judgment filed by the Defendant (*Docket No. 70*) will be granted, and the motion for summary judgment filed by the Plaintiffs (*Docket No. 74*) will be denied.

## II.    Background

At all times relevant to this case, the Association of Community Organizations for Reform Now ("ACORN") was a national organization dedicated to promoting social and economic justice for individuals and families with low and moderate incomes. Docket Nos. 75 & 81 at ¶ 5. Project Vote is a nonpartisan, nonprofit organization seeking to increase the levels of electoral participation among individuals living in low-income, moderate-income and minority communities. *Id.* at ¶ 10. Project Vote has been developing voter-registration and "Get-Out-The-Vote" programs since 1994. *Id.* at ¶ 12. Throughout the past seventeen years,

Project Vote has collected more than 5.6 million voter-registration applications from citizens living in Pennsylvania's low-income and minority communities. *Id.* Some of Project Vote's electoral activities were conducted in partnership with ACORN. *Id.* at ¶ 13. Maryellen Deckard ("Deckard") is a Pennsylvania resident who once served as the head organizer for ACORN's Pittsburgh office. *Id.* at ¶ 15. In that capacity, she directed ACORN's local voter-registration drive in 2008. *Id.* at ¶ 16. Deckard intends to participate in future voter-registration drives in Pennsylvania. *Id.* at ¶ 17. At the present time, Project Vote is developing plans to conduct voter-registration drives during the 2012 election season. *Id.* at ¶ 14.

Prior to the 2008 general election, there were thousands of eligible individuals residing in Allegheny County, Pennsylvania, who had not registered to vote. *Id.* at ¶ 28. Both ACORN and Project Vote attempted to alleviate this problem by expanding their voter-registration activities in Allegheny County. *Id.* Project Vote developed a voter-registration model involving the use of paid canvassers to locate unregistered individuals and assist them with the registration process. *Id.* at ¶¶ 29-30. Canvassers were generally expected to discuss the importance of voting and issues of mutual concern while assisting prospective voters in their efforts to register. *Id.* at ¶ 31.

ACORN implemented Project Vote's voter-registration model by hiring paid canvassers. *Id.* at ¶ 32. Deckard served as one of ACORN's supervisors. *Id.* at ¶¶ 33, 38, 41. During the 2008 election season, ACORN hired more than 300 canvassers in Allegheny County. *Id.* at ¶ 35. The canvassers typically worked six-hour shifts and were paid at the rate of $8.00 per hour. *Id.* at ¶ 33. Each employee was paid on an hourly basis regardless of the number of voter-registration applications secured during the course of his or her shift. *Id.* at ¶ 34. No commission payments or financial incentives were awarded based on the number of applications procured by individual canvassers. *Id.* at ¶ 32. ACORN merely set an "aspirational" goal of

twenty applications per shift for each employee. *Id.* at ¶ 37. The average canvasser collected slightly more than thirteen applications per shift. *Id.* at ¶ 40. Roughly 81% of the canvassers failed to satisfy ACORN's production-based expectations. *Id.* at ¶ 39. No employee was terminated for failing to meet his or her performance goal on a single occasion. *Id.* at ¶ 41. Instead, canvassers who failed to perform up to ACORN's expectations were afforded opportunities to improve their techniques for engaging potential voters. *Id.* at ¶ 42. ACORN submitted approximately 40,000 new voter-registration applications to the Allegheny County Elections Division ("Elections Division") during the first ten months of 2008. *Id.* at ¶ 38.

On May 7, 2009, Allegheny County District Attorney Stephen Zappalla ("District Attorney") filed criminal charges against seven individuals, alleging that they had committed criminal offenses related to the submission of fraudulent voter-registration applications. *Id.* at ¶ 43. Five of the seven individuals charged with crimes were former ACORN canvassers. *Id.* All seven individuals were charged, *inter alia*, with violations of 25 PA. CONS. STAT. § 1713, which provides:

> **§ 1713. Solicitation of registration**
> **(a) Prohibition.**—A person may not give, solicit or accept payment or financial incentive to obtain a voter registration if the payment or incentive is based upon the number of registrations or applications obtained.
> **(b) Penalty.**—A person who violates subsection (a) commits a misdemeanor of the third degree and shall, upon conviction, be sentenced to pay a fine of not less than $500 nor more than $2,500 or to imprisonment for not less than one month nor more than one year, or both.

25 PA. CONS. STAT. § 1713. The District Attorney pursued the charges under § 1713 based on language contained in the related affidavits of probable cause suggesting that the charged individuals had been hired by ACORN in June 2008 and terminated three weeks later for failing to satisfy a daily registration "quota." Docket Nos. 75 & 81 at ¶ 46.

ACORN commenced this official-capacity action against the District Attorney and Attorney General Tom Corbett ("Corbett") on July 22, 2009, alleging that § 1713, both on its face and "as applied" by the District Attorney, was violative of the First and Fourteenth Amendments to the United States Constitution. Docket No. 1. On October 27, 2009, the Court approved a consent agreement that had been executed by ACORN and the District Attorney. Docket No. 19. Pursuant to the terms of the consent agreement, the District Attorney was voluntarily dismissed from this action pursuant to Federal Rule of Civil Procedure 41(a)(1). *Id.* at ¶ 5. In exchange for his dismissal, the District Attorney agreed not to prosecute ACORN under § 1713 during the pendency of this case, provided that ACORN continued to compensate its canvassers at an hourly rate rather than on the number of voter-registration applications procured.[1] *Id.* at ¶ 3. The District Attorney also agreed to be bound by the interpretation of § 1713 established by a final determination in this action. *Id.* at ¶ 4. The Court retained jurisdiction over the District Attorney only for the purpose of enforcing the terms of the consent agreement. *Id.* at ¶ 5.

ACORN announced on March 23, 2010, that its offices in Pittsburgh would be closing on or before April 1, 2010. Docket No. 31 at ¶ 8. On April 15, 2010, ACORN sought leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).[2] *Id.* at ¶ 5. The purpose of the proposed amendment was to add Project Vote and Deckard as plaintiffs. *Id.* Corbett responded two weeks later by filing a brief in opposition to ACORN's motion, contending that ACORN's decision to close its Pittsburgh offices had essentially mooted the preexisting "case" or "controversy." Docket No. 32 at 6-12. He argued that ACORN no longer

---

[1] The charges brought against the seven individuals under § 1713 were apparently dropped after the individuals agreed to enter guilty pleas relating to other charges. Docket No. 82 at ¶ 45.
[2] Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend should freely be given "when justice so requires." FED. R. CIV. P. 15(a)(2).

had standing under Article III to pursue this action, and that the jurisdictional defect could not be cured by the addition of other plaintiffs.  *Id.*

Shortly after a telephone conference conducted with the parties on May 28, 2010, the Court granted ACORN's motion for leave to amend pursuant to Federal Rule of Civil Procedure 21.  Docket No. 37.  Rule 21 provides:

> Misjoinder of parties is not a ground for dismissing an action.  On motion or on its own, the court may at any time, on just terms, add or drop a party.  The court may also sever any claim against a party.

FED. R. CIV. P. 21.  The Court permitted ACORN to add Project Vote and Deckard as plaintiffs because the United States Supreme Court and the United States Court of Appeals for the Third Circuit had previously recognized that Rule 21 could be used as a mechanism for curing perceived jurisdictional defects.  *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832-837, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989); *Mullaney v. Anderson*, 342 U.S. 415, 416-417, 72 S.Ct. 428, 96 L.Ed. 458 (1952); *Balgowan v. New Jersey*, 115 F.3d 214, 216-218 (3d Cir. 1997).

ACORN filed its amended complaint on June 7, 2010, adding Project Vote and Deckard as plaintiffs.[3]  Docket No. 38 at ¶¶ 5-10.  Corbett filed his answer on June 17, 2010.  Docket No. 39.  On July 16, 2010, Corbett filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Docket No. 49.  Although Corbett conceded that the Plaintiffs had standing to challenge § 1713 on its face, he argued that they could not challenge the statute "as applied" by the District Attorney, who was no longer a party to the case.  Docket No. 50 at 3-8.  The Court denied the motion in a memorandum opinion and order dated September 28, 2010. *ACORN v. Corbett*, Civil Action No. 09-951, 2010 WL 3885373, 2010 U.S. Dist. LEXIS 102798 (W.D.Pa. Sept. 28, 2010).  The denial was premised on language in *Citizens United v. Federal*

---

[3] Deckard's name was Maryellen Hayden when the amended complaint was filed.  Docket No. 77-1 at ¶ 2.

*Election Commission*, ___U.S.___, ___, 130 S.Ct. 876, 893, 175 L.Ed.2d 753 (2010), explaining

that the distinction between facial and as-applied challenges "goes to the breadth of the remedy

employed by the Court" rather than to "what must be pleaded in a complaint." *ACORN*, 2010

WL 3885373, at *6-7, 2010 U.S. Dist. LEXIS 102798, at *19-24.

ACORN subsequently filed for bankruptcy and ceased all of its operations.  The parties

stipulated to ACORN's dismissal from this case on November 4, 2010.  Docket Nos. 64 & 65.

On January 18, 2011, Corbett was inaugurated as Pennsylvania's new Governor.  Governor Tom

Corbett, http://www.governor.state.pa.us/portal/server.pt/community/governor_corbett/19926 (as

visited on June 14, 2011).  William H. Ryan, Jr. ("Ryan"), who served as Pennsylvania's Acting

Attorney General after Corbett's inauguration, became the new official-capacity Defendant in

this action pursuant to Federal Rule of Civil Procedure 25(d).[4]  Docket No. 70 at 1, n. 1.  Ryan

and the Plaintiffs filed cross-motions for summary judgment on April 11, 2011.  Docket Nos. 70

& 74.  On May 27, 2011, Linda L. Kelly ("Attorney General") became Pennsylvania's new

Attorney General, thereby making her the new official-capacity Defendant in this case.

Pennsylvania Attorney General, http://attorneygeneral.gov/ (as visited on June 14, 2011).  The

parties were afforded an opportunity to advance their respective positions during the course of a

hearing conducted on June 1, 2011.  Docket Nos. 85 & 86.  The pending motions for summary

judgment are the subject of this memorandum opinion.

## III.   <u>Standard of Review</u>

Summary judgment may only be granted where the moving party shows that there is no

genuine dispute as to any material fact, and that a judgment as a matter of law is warranted.  FED.

R. CIV. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary

---

[4] When a defendant sued in his or her official capacity leaves office, his or her successor becomes the new official-capacity defendant by operation of law.  FED. R. CIV. P. 25(d); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV. **Discussion**

In this action for injunctive and declaratory relief, the Plaintiffs challenge the constitutional validity of § 1713. Their claims are cognizable under 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or

usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. This statutory provision "does not create substantive rights," but instead "provides a remedy for the violation of rights conferred by the Constitution or other statutes." *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federal constitutional or statutory right. *Collins v. City of Harker Heights*, 503 U.S. 115, 119, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)(remarking that § 1983 "does not provide a remedy for abuses that do not violate federal law"). "Section 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." *Board of County Commissioners v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), quoting *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

The first step in the Court's analysis is to "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST., AMEND. I. The Due Process Clause of the Fourteenth Amendment prohibits a State from "depriv[ing] any person of life, liberty, or property, without due process of law . . . ." U.S. CONST., AMEND. XIV, § 1. The "freedom of speech," which is "secured by the First Amendment

against abridgment by the United States," is "among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State." *Thornhill v. Alabama*, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

The First Amendment, which is applicable to the States by virtue of the Fourteenth Amendment's Due Process Clause, prohibits Pennsylvania from enacting a law which abridges the "freedom of speech." U.S. CONST., AMEND. I. Nothing in the text of § 1713 purports to restrain or limit *speech*. 25 PA. CONS. STAT. § 1713(a). Nevertheless, the Supreme Court has determined that the Free Speech Clause prohibits a State from significantly burdening potential speakers with financial disincentives to speak. *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105, 115-118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). Since the availability of compensation often induces individuals to engage in expressive activities, a governmental entity may not unreasonably impede the provision of compensation to individuals who wish to engage in such activities for pay. *United States v. National Treasury Employees Union*, 513 U.S. 454, 468-477, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). State-imposed disincentives to write or speak are constitutionally suspect not only because they induce individuals to "curtail their expression," but also because they place "a significant burden on the public's right to read and hear what the [individuals] would otherwise have written and said." *Id.* at 469-470.

A.    **The Constitutional Considerations Underpinning the Plaintiffs' Claims**

The Plaintiffs' challenge to § 1713 is rooted in *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). *Meyer* involved a constitutional challenge to a Colorado criminal statute prohibiting the payment or receipt of money in exchange for a canvasser's act of circulating a petition to place an initiative on the ballot. *Meyer*, 486 U.S. at 415-416. Under

Colorado law, proponents of an initiative were able to have it placed on the ballot for a popular vote if they could secure, within a period of six months, a number of signatures equal to 5% of the total number of individuals who had voted for a candidate for the office of Secretary of State during the preceding general election. *Id.* at 416. The initiative process was available to those who wished to enact a new law or amend the Colorado Constitution. *Id.* at 415-416. The challenged statute purported to prohibit the proponents of an initiative from paying canvassers to circulate petitions. *Id.* Although the statutory provision did not specifically limit or restrain "speech," the Supreme Court determined that it was sufficiently burdensome to potential speakers to warrant a heightened degree of judicial scrutiny. *Id.* at 425. Speaking through Justice Stevens, a unanimous Supreme Court explained:

> The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

*Id.* at 421-422 (footnote omitted). Having explained why the challenged statute raised constitutional concerns, the Supreme Court went on to observe:

> The refusal to permit appellees to pay petition circulators restricts political expression in two ways: First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

*Id.* at 422-423.  It was noted that the prohibition had the practical effect of restricting access to "direct one-on-one communication," which was described as "the most effective, fundamental, and perhaps economical avenue of political discourse."  *Id.* at 424.

Because the statute challenged in *Meyer* impinged upon First Amendment freedoms in an area in which constitutional protection was "at its zenith," the Supreme Court described the burden placed upon Colorado to justify its criminal law as "well-nigh insurmountable."  *Id.* at 425.  The State argued that the law was needed to secure its interest in making sure that an initiative had sufficient grass-roots support to be placed on the ballot, but the Supreme Court determined that the minimum-signature requirement was itself sufficient to address that concern. *Id.* at 425-426.  In response to Colorado's contention that compensation might provide a professional circulator with a temptation to disregard a distinct statutory provision requiring him or her to verify the authenticity of all signatures collected on a petition, the Supreme Court expressed an unwillingness to assume that such a circulator, whose ability to obtain future assignments was dependent upon "a reputation for competence and integrity," was more likely "to accept false signatures" than a volunteer who was motivated solely by a desire to have an initiative placed on the ballot for popular consideration.  *Id.* at 426.  Separate statutory provisions prohibiting forgeries and false statements in connection with the initiative process were found to be "adequate to the task of minimizing the risk of improper conduct" relating to the circulation of initiative petitions.  *Id.* at 427.  Consequently, the statutory provision prohibiting the payment of petition circulators was found to be in violation of the First and Fourteenth Amendments.  *Id.* at 428.

More than a decade after deciding *Meyer*, the Supreme Court again considered the constitutionality of statutes purporting to regulate Colorado's initiative process.  In *Buckley v.*

*American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 186-187, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), the Supreme Court invalidated three separate statutory provisions. The provisions at issue limited the pool of petition circulators to registered Colorado voters, required paid[5] circulators to wear identification badges while soliciting signatures, and compelled proponents of initiatives to file reports specifically identifying each paid circulator and listing the amount of money paid to him or her. *Buckley*, 525 U.S. at 186. The provision requiring circulators to be registered voters was found to be unconstitutional because it "drastically reduce[d] the number of persons, both volunteer and paid, [who were] available to circulate petitions." *Id.* at 193. The remaining two provisions were invalidated because they discouraged participation in the initiative process by forcing paid circulators to surrender their anonymity. *Id.* at 197-204. Like the statutory prohibition at issue in *Meyer*, the restrictions challenged in *Buckley* were found to be invalid under the First and Fourteenth Amendments because they limited both "the number of voices" available to convey the messages advanced by initiative proponents and the ability of such proponents to secure enough signatures to make a particular initiative "the focus of statewide discussion." *Id.* at 194-195; *Meyer*, 486 U.S. at 422-423. Although none of the challenged restrictions specifically *prohibited* "speech," the Supreme Court invalidated them pursuant to its obligation "to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley*, 525 U.S. at 192.

**B.      The Procedural Posture of this Case**

Relying on the First Amendment, the Plaintiffs purport to challenge § 1713 both on its face and "as applied" by the District Attorney. Docket No. 38 at ¶¶ 73-78. They further allege that the District Attorney's broad reading of § 1713 constituted such "an unreasonable,

---

[5] While paid circulators were required to wear badges bearing their names, unpaid circulators were only required to wear badges identifying themselves as "volunteer" circulators. *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 188, n. 5, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999).

unforeseeable expansion" of the statutory language that any convictions thereunder for the conduct described in the affidavits of probable cause would have been constitutionally infirm under the Due Process Clause.[6] *Id.* at ¶ 79. The Plaintiffs seek, *inter alia*, a judgment declaring § 1713 to be unconstitutional (both on its face and "as applied" by the District Attorney) and an order enjoining its enforcement. *Id.* at ¶¶ A-B.

Alexis M. Givner ("Givner") was one of the seven individuals charged with a violation of § 1713. The affidavit of probable cause filed in support of the charge alleged that, on October 23, 2008, Givner had told a detective that she had been hired as a canvasser by ACORN in June 2008 and fired three weeks later for failing to reach her "assigned quota" of twenty-two voter-registration applications per day. Docket No. 77-1 at 28. The affidavit did not specifically allege that Givner had given, solicited or accepted a "payment" or "financial incentive" that was "based upon the number of registrations or applications obtained." 25 PA. CONS. STAT. § 1713(a). The statements contained in the probable-cause affidavits relating to the remaining six defendants were not materially different from those contained in the probable-cause affidavit relating to Givner. Docket No. 75 at ¶ 46, n. 2. According to the Plaintiffs, the statements found in these seven probable-cause affidavits demonstrate that the District Attorney construed § 1713 broadly enough to prohibit ACORN and similarly-situated entities from discharging canvassers who were not obtaining a satisfactory amount of voter-registration applications. Docket No. 76 at 3-4. Their as-applied challenge to § 1713 is based on the premise that Pennsylvania cannot constitutionally prohibit entities such as ACORN and Project Vote from employing paid canvassers and holding them to production-based expectations. *Id.* at 14-18. Their facial

---

[6] This allegation was included in both the original and amended complaints. Docket No. 1 at ¶ 74; Docket No. 38 at ¶ 79. Nevertheless, it appears to be inconsistent with the Plaintiffs' present position concerning the issue of statutory construction. Docket No. 76 at 10-13.

challenge to the statute is grounded in the idea that Pennsylvania cannot constitutionally prohibit them from doing what the plain language of § 1713 proscribes. *Id.* at 21-23.

This matter comes before the Court in a rather unusual posture. In light of the consent agreement executed by ACORN and the District Attorney, the District Attorney is no longer a defendant in this action. Docket No. 19 at ¶ 5. Moreover, ACORN is no longer a plaintiff in this case because of its bankruptcy and consequent cessation of operations. Docket Nos. 64 & 65. The Attorney General contends that the Plaintiffs cannot challenge § 1713 "as applied" by the District Attorney, since neither of the parties to the underlying dispute are presently before the Court. Docket No. 71 at 18-20. During the course of the hearing conducted on June 1, 2011, the Deputy Attorney General conceded that § 1713 would be unconstitutional if it were to be construed broadly enough to prohibit Project Vote (or a similarly-situated organization) from paying canvassers on an hourly basis and terminating them for failing to secure an acceptable number of voter-registration applications. Docket No. 86 at 47, 85. He also stated on the record that this position was consistent with the views of the Attorney General, who had commenced her duties subsequent to the most recent filings in this case. *Id.* at 4. The Attorney General argues that the Plaintiffs are seeking "to obtain an advisory opinion regarding the constitutionality of the [District Attorney's] specific prosecutorial policies," and that this Court has no jurisdiction to provide such an opinion. Docket No. 80 at 14. She does not question the standing of the Plaintiffs to challenge § 1713 on its face. *Id.*

In a declaration dated April 10, 2011, Michael Slater ("Slater"), Project Vote's Executive Director, stated that Project Vote is actively developing plans to conduct voter-registration drives in Pennsylvania during the 2012 election season. Docket No. 77-1 at 6, ¶ 9. He declared that, at a minimum, Project Vote will pay canvassers on an hourly basis and establish productivity goals

for motivational purposes. *Id.* at 8, ¶ 23. Slater further asserted that if paying canvassers based on the number of voter-registration applications procured were deemed to be "the most effective way to stimulate canvassers to collect valid applications from eligible applicants," Project Vote would want to adopt that payment system. *Id.* at 8, ¶ 24 (emphasis omitted).

The existence of a "case" or "controversy" sufficient to satisfy the jurisdictional requirements of Article III "is a prerequisite to all federal actions," including those in which the relief sought is prospective in nature. *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994). In order to establish the existence of a live "case" or "controversy," a plaintiff must demonstrate that: (1) he or she has suffered, or is about to suffer, an "injury in fact" (*i.e.*, an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, and not merely conjectural or hypothetical); (2) there is a causal relationship between his or her injury and the alleged conduct of the defendant; and (3) it is likely that the injury would be redressed by a judgment rendered in his or her favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In a case involving a pre-enforcement facial challenge to a statute alleged to be in violation of the First Amendment, "even the remotest threat of prosecution, such as the absence of a promise not to prosecute," can satisfy the injury-in-fact requirement. *Peachlum v. City of York*, 333 F.3d 429, 435 (3d Cir. 2003). Where a statutory prohibition implicates First Amendment rights, there is a danger that the statute's "very existence" will cause individuals to refrain from engaging in constitutionally-protected activities rather than run the risk of being prosecuted. *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The Supreme Court has described this danger of "self-censorship" as "a harm that can be realized even without an actual prosecution." *Virginia v. American Booksellers Association,*

*Inc.*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). Although the Attorney General rejects the idea that § 1713 prohibits Project Vote and similarly-situated entities from holding hourly canvassers to production-based expectations, she does not suggest that individuals who actually give, solicit or accept payments or financial incentives "based upon the number of registrations or applications obtained" will not be prosecuted. Docket No. 80 at 10-14. A causal relationship exists between the threat of prosecution under § 1713 and the manner in which Project Vote plans to pay its canvassers in 2012. Docket No. 77-1 at 8-9, ¶¶ 23-28. Furthermore, an order enjoining the enforcement of § 1713 would clearly redress the constitutional injury alleged. Accordingly, the Court has subject-matter jurisdiction to entertain the Plaintiffs' facial challenge to § 1713.

As noted earlier, the Attorney General argues that this Court cannot provide the Plaintiffs with an "advisory opinion" concerning the constitutionality of § 1713 "as applied" by the District Attorney. Docket No. 80 at 14. The Attorney General is correct in her belief that federal courts do not have jurisdiction to render "advisory opinions." *Michigan v. Long*, 463 U.S. 1032, 1041-1042, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Under the precise circumstances of this case, however, constitutional considerations must be factored into the question of how § 1713 should be construed. Indeed, the Attorney General concedes that the statute would be unconstitutional if it were to be interpreted broadly enough to prohibit the termination of unproductive hourly employees. Docket No. 86 at 47, 85. Under the Supreme Court's "overbreadth" doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). "The first step in overbreadth analysis is to construe the challenged statute," since "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* at 293.

16

Because the Court must ascertain the reach of § 1713 in order to determine whether it is substantially overbroad, the Plaintiffs' facial challenge cannot be adjudicated without reference to the competing interpretations of the statutory language posited by the parties in this case.

## C.      The Construction of § 1713(a)

The Court must "construe the challenged statute" before determining whether it "reaches too far" to withstand constitutional scrutiny. *Williams*, 553 U.S. at 293. The language at issue is contained in § 1713(a), which provides that "[a] person may not give, solicit or accept payment or financial incentive to obtain a voter registration if the payment or financial incentive is based upon the number of registrations or applications obtained."[7] 25 PA. CONS. STAT. § 1713(a). The affidavit of probable cause filed in support of the criminal charges brought against Givner suggests that the District Attorney interpreted § 1713(a) to prohibit an entity such as ACORN from discharging a canvasser for failing to meet production-based expectations. Docket No. 77-1 at 28. The Plaintiffs argue that this "enforcement history" requires the Court to construe § 1713(a) as broadly as the District Attorney did in determining whether the statutory prohibition is facially constitutional. Docket No. 76 at 10-13. The Attorney General disavows this proposed construction of the statute. Docket No. 71 at 20-23. She concedes that § 1713(a) would be unconstitutional if it were to be construed in the manner posited by the Plaintiffs. Docket No. 80 at 13; Docket No. 86 at 47, 85. The Attorney General contends that the statutory language should be read to prohibit only the use of "piece-rate" or commission payments in the voter-registration context. Docket No. 80 at 10-14.

---

[7] The plain language of § 1713(a) targets *conduct* (*i.e.*, the giving, solicitation or acceptance of a "payment or financial incentive . . . based upon the number of registrations or applications obtained") rather than *pure speech*. 25 PA. CONS. STAT. § 1713(a). In order for a statute regulating "conduct and not merely speech" to be facially invalid under the First Amendment, "the overbreadth of [the] statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

The Supreme Court regularly applies the canon of "constitutional avoidance" when ambiguous federal statutes raise grave constitutional concerns. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994)(remarking that it is incumbent upon a court to read a federal statute to eliminate "serious constitutional doubts" whenever "such a reading is not plainly contrary to the intent of Congress"). This canon is a rule of statutory construction counseling that "ambiguous statutory language" be construed in conformity with constitutional requirements. *Federal Communications Commission v. Fox Television Stations, Inc.*, ___U.S. ___, ___, 129 S.Ct. 1800, 1811, 173 L.Ed.2d 738 (2009). "It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable assumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). "The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* at 385. It "has no application" in the absence of ambiguous statutory language. *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 494, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001). A federal court has no authority to rewrite an unambiguous statutory provision in order to sustain its validity or avoid a difficult constitutional question. *Reno v. ACLU*, 521 U.S. 844, 884-885, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

Federal courts lack the "competence to rule definitively on the meaning of state legislation." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 48, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). When a challenge is brought against a state statute that has been authoritatively construed by the relevant State's highest court, a federal court is bound by that construction in determining whether the statute violates the Constitution. *New York v. Ferber*,

458 U.S. 747, 769, n. 24, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). This Court is aware of no

decision by a Pennsylvania court delineating the scope of § 1713(a).[8] "In the absence of a

limiting construction from a state authority, [a federal court] must 'presume any narrowing

construction or practice to which the law is fairly susceptible.'" *Brown v. City of Pittsburgh*, 586

F.3d 263, 274 (3d Cir. 2009), quoting *City of Lakewood v. Plain Dealer Publishing Co.*, 486

U.S. 750, 770, n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)(internal quotation marks omitted).

Federal courts generally construe state statutes to avoid constitutional difficulties whenever it is

reasonably possible to do so. *Davet v. City of Cleveland*, 456 F.3d 549, 554 (6th Cir. 2006).

Nonetheless, a federal court may not "rewrite a state law to conform it to constitutional

requirements." *American Booksellers Association*, 484 U.S. at 397.

The Pennsylvania General Assembly has specifically enacted a rule of statutory

construction declaring that it "does not intend to violate the Constitution of the United States." 1

PA. CONS. STAT. § 1922(3). The Pennsylvania courts apply the canon of constitutional

avoidance when the validity of an ambiguous Pennsylvania statute is drawn into question.

*Maryland Casualty Co. v. Odyssey Contracting Corp.*, 894 A.2d 750, 757 (Pa.Super.Ct. 2006).

In addition, the General Assembly has expressly directed that all "[p]enal provisions" be "strictly

construed." 1 PA. CONS. STAT. § 1928(b)(1). This statutory direction is rooted in the "rule of

lenity," which is based on the understanding that ambiguous language defining a criminal

offense should not be construed broadly. *Commonwealth v. Graham*, 9 A.3d 196, 202, n. 13 (Pa.

2010). In this vein, the Pennsylvania Supreme Court has explained that "where doubt exists

concerning the proper scope of a penal statute, it is the accused who should receive the benefit of

---

[8] Section 1713 was signed into law by Governor Mark S. Schweiker on February 13, 2002. 2002 Pa. Laws 3, § 1713. It was copied verbatim from a previous statute signed into law by Governor Thomas J. Ridge on June 30, 1995. 1995 Pa. Laws 25, § 1513 (previously codified at 25 PA. STAT. § 961.1513). The Court is aware of no judicial decision interpreting § 1713 or its statutory predecessor.

such doubt." *Commonwealth v. Booth*, 766 A.2d 843, 846 (Pa. 2001). The meaning and scope of § 1713(a) must be ascertained in light of these legal principles.

In his declaration, Slater stated that Project Vote's canvassers typically discuss "issues of importance to low-income and minority communities" and "the importance of voting" while trying to convince unregistered individuals to complete voter-registration applications. Docket No. 77-1 at 7, ¶ 13. The Attorney General does not dispute Slater's statement. Docket Nos. 75 & 81 at ¶ 31. Therefore, the Court's analysis proceeds on the assumption that Project Vote's canvassing activities typically involve "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421-422. Although § 1713(a) does not specifically prohibit political speech, it is subject to judicial scrutiny under the First Amendment to the extent that it burdens the expressive activities engaged in by the Plaintiffs. *Id.* at 424. Since § 1713(a) implicates important constitutional rights, the Court must consider whether the challenged statutory language is "fairly susceptible" to a narrowing construction. *Brown*, 586 F.3d at 274.

The Plaintiffs contend that the "plain language" and "enforcement history" of § 1713(a) confirm that it prohibits "productivity goals" as well as "commission payments." Docket No. 76 at 10-13. They go on to argue that the statutory prohibition, when construed in this manner, makes it infeasible for entities such as ACORN and Project Vote to conduct paid voter-registration drives. *Id.* at 14-18. In support of their position, the Plaintiffs rely on last year's Supreme Court decision in *United States v. Stevens*, ___U.S.___, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). In *Stevens*, the Supreme Court explained that a federal court entertaining a constitutional challenge to a law cannot rewrite unambiguous statutory provisions in order to preserve them. *Stevens*, 130 S.Ct. at 1588-1592.

The argument advanced by the Plaintiffs is unpersuasive, and the reliance that they place on *Stevens* is misplaced. In their brief, the Plaintiffs argue that the phrase "based upon," as used in § 1713(a), "is ambiguous and can be interpreted in more than one way." Docket No. 76 at 11. They further state that the phrase "is sufficiently vague to encompass both commission payments and the use of productivity goals." *Id.* In light of their contention that the challenged statutory provision *is* ambiguous, it is difficult to fathom how the Plaintiffs believe that *Stevens* helps their case with respect to the issue of statutory interpretation. The statute at issue in *Stevens* was *not* ambiguous and, therefore, *not* susceptible to a more narrow construction. *Stevens*, 130 S.Ct. at 1588 ("But the phrase 'wounded . . . or killed' at issue here contains little ambiguity."). After all, it is *ambiguous* statutory language (rather than *unambiguous* statutory language) that should ordinarily "be construed to avoid serious constitutional doubts." *Fox Television Stations*, 129 S.Ct. at 1811. The argument put forth by the Plaintiffs concerning the alleged ambiguity of § 1713(a), if accepted by the Court, would counsel in *favor* of a determination that the statutory prohibition is "fairly susceptible" to a "narrowing construction." *Clark*, 543 U.S. at 385 (describing the canon of constitutional avoidance as a means of choosing between competing interpretations of a statute that is "found to be susceptible of more than one construction").

The Attorney General contends that the "plain language" of § 1713(a)'s statutory prohibition extends only to "piece-rate" and commission payments. Docket No. 80 at 13. She asserts that it does not prohibit "productivity goals" of the kind utilized by Project Vote. *Id.* Under the Attorney General's proposed construction of § 1713(a), it would not be unlawful for an employing entity to terminate a canvasser for failing to secure a specific number of voter-registration applications during the course of a single shift, provided that the canvasser is properly paid his or her hourly wage for completing that shift. Docket No. 86 at 66-67. To put it

more concretely, the Attorney General does not believe that § 1713(a) prohibited ACORN from discharging Givner for failing to reach her "assigned quota." Docket No. 77-1 at 28.

The language of § 1713(a) prohibits only the giving, solicitation or acceptance of a "*payment* or *financial incentive* to obtain a voter registration if the *payment* or *incentive* is based upon the number of registrations or applications obtained." 25 PA. CONS. STAT. § 1713(a)(emphasis added). It says nothing about the circumstances in which an employer may *discharge* an employee. Statutes governing the employer/employee relationship ordinarily refer to one's rate of compensation as a term, condition or privilege "of employment." 29 U.S.C. § 623(a)(1); 42 U.S.C. §§ 2000e-2(a)(1), 12112(a); 43 PA. STAT. § 955(a). They do not equate an employee's "compensation" with the very *existence* of the employment relationship. *Id.*

A typical employment relationship consists of a contractual engagement involving the provision of services in exchange for "payment." The relationship is dependent upon both sides of this bargained-for exchange. *Shupp v. Unemployment Compensation Board of Review*, 18 A.3d 462, 465 (Pa.Commw.Ct. 2011)(observing that an employer's "failure to make timely payment for services rendered creates a real and substantial pressure upon an employee to terminate employment"). Under Pennsylvania law, an employee who is separated from employment is still entitled to be paid for any services rendered prior to the separation. 43 PA. STAT. § 260.5(a); *Sullivan v. Chartwell Investment Partners, LP*, 873 A.2d 710, 716 (Pa.Super.Ct. 2005). Pennsylvania's Wage Payment and Collection Law [43 PA. STAT. § 260.1 *et seq.*] defines the term "wages" broadly enough to include all of an employee's earnings without regard to whether such earnings are determined on the basis of "time, task, piece, commission or [some] other method of calculation." 43 PA. STAT. § 260.2a. Regardless of how it is calculated, an employee's "payment" constitutes only one side of an employment contract.

It does not encompass the entire contractual relationship. *Rock v. Unemployment Compensation Board of Review*, 6 A.3d 646, 649-650 (Pa.Commw.Ct. 2010).

This same line of reasoning applies to the term "financial incentive." The "incentive" referenced in § 1713(a) triggers a corresponding action on the part of a canvasser (*i.e.*, the procurement of a "voter registration"). 25 PA. CONS. STAT. § 1713(a). It does not account for the entire engagement. *Pegram v. Herdich*, 530 U.S. 211, 218, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)("In a fee-for-service system, a physician's *financial incentive* is to provide more care, not less, so long as *payment* is forthcoming.")(emphasis added). An employee's *incentive* to perform certain tasks within the context of an employment relationship cannot be equated with the *continued existence* of the relationship itself. Indeed, a "financial incentive" can sometimes be used to facilitate the *termination* of an employment relationship. *Lockheed Corp. v. Spink*, 517 U.S. 882, 885, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); *Johnson v. Unemployment Compensation Board of Review*, 869 A.2d 1095, 1118 (Pa.Commw.Ct. 2005).

Section 1713(a) is not like the Ohio statute at issue in *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 377 (6th Cir. 2008), which provided that "[n]o person shall pay any other person for collecting signatures on election-related petitions or for registering voters except on the basis of time worked." In *Deters*, the United States Court of Appeals for the Sixth Circuit intimated that the statute could be interpreted to prohibit the termination of an unproductive employee. *Deters*, 518 F.3d at 386 ("Arguably, CTR could not terminate a circulator who consistently did not collect enough signatures because, again, to earn a wage (and keep the job) the circulator would, among other things, have to collect a minimum number of signatures."). The Ohio statute, however, defined the relevant criminal offense by reference to what was *permitted* rather than by reference to what was *prohibited*. *Id.* at 385-387. It obviously proscribed an unspecified

and indefinite range of conduct. *Id.* Section 1713(a) describes the conduct that is prohibited, and the General Assembly has directed that it be "strictly construed." 1 PA. CONS. STAT. § 1928(b)(1).

There is no basis in law, reason or common sense to construe § 1713(a) to prohibit an entity from discharging a canvasser for failing to secure a minimum number of voter-registration applications during the course of a particular shift (or over the course of several shifts). The broad construction of § 1713(a) posited by the Plaintiffs runs counter to the canon of constitutional avoidance, the rule of lenity, the law's ordinary treatment of the employment relationship, and the plain meaning of the statutory text.[9] Docket No. 83 at 1-3. Moreover, the position taken by the Plaintiffs at this stage is inconsistent with the pleadings contained in the original and amended complaints. When the original complaint was filed, ACORN characterized the District Attorney's interpretation of § 1713(a) as "an unreasonable, unforeseeable expansion of the statute." Docket No. 1 at ¶ 74. A similar averment was included in the amended complaint. Docket No. 38 at ¶ 79. The Plaintiffs were apparently attempting to assert claims under the Due Process Clause pursuant to the Supreme Court's decision in *Bouie v. City of Columbia*, 378 U.S. 347, 352, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). In *Bouie*, the Supreme Court explained that an individual's "right to fair warning" under the Due Process Clause can be violated not only by a conviction secured under a vaguely-worded criminal statute, but also by "an unforeseeable and retroactive judicial expansion of *narrow and precise statutory language*." *Bouie*, 378 U.S. at 354 (emphasis added). The Plaintiffs now challenge § 1713(a) only on First Amendment grounds. Docket No. 86 at 38-39. The abandonment of their claims under the Due Process Clause is certainly understandable, since the District Attorney is no longer a defendant in

---

[9] In *On Our Terms '97 PAC v. Secretary of State*, 101 F.Supp.2d 19, 26, n. 10 (D.Me. 1999), the United States District Court for the District of Maine construed a similarly-worded statute applicable to Maine's initiative process "to prohibit only the practice of direct payment per signature."

this case. Nonetheless, this earlier invocation of *Bouie* lends credence to the Court's determination that the "narrow and precise statutory language" found in § 1713(a) cannot be read to preclude conduct of the kind engaged in by ACORN, Project Vote and Deckard. Accordingly, the Court will consider the Plaintiffs' facial challenge to § 1713(a) with the understanding that the statutory provision does not prohibit entities like ACORN and Project Vote from discharging unproductive canvassers. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975)(explaining that "a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts").

**D.    The Appropriate Level of Judicial Scrutiny**

"A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster*, 502 U.S. at 115. The Supreme Court's precedents "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints," but also to restrictions on the public discussion of entire topics. *Consolidated Edison Co. of New York v. Public Service Commission*, 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). In determining whether a particular regulation is content-based or content-neutral, a court "must look to the purpose behind the regulation." *Bartnicki v. Vopper*, 532 U.S. 514, 526, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). Where the purpose of a law is to restrict or burden speech because of the speaker's message, that purpose will alone suffice to render the law content-based. *United States v. Marcavage*, 609 F.3d 264, 279 (3d Cir. 2010). Even if the primary *purpose* of a law is unrelated

to the speaker's message, the law can still be content-based if it facially discriminates against a disfavored subject or viewpoint. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395-396, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner Broadcasting System*, 512 U.S. at 643. "By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral." *Id.*

In *Maryland v. Brookins*, 844 A.2d 1162, 1169-1181 (Md. 2004), the Maryland Court of Appeals relied on *Meyer* to invalidate a Maryland statute prohibiting political candidates and campaigns from paying individuals to engage in certain campaign-related activities on the day of an election. The Court of Appeals found the statute to be content-based because it proscribed the provision of payment for election-day speech precisely because the speech was related to a political campaign. *Brookins*, 844 A.2d at 1176. Since the law was content-based, the applicable standard of review was strict scrutiny. *Id.* at 1168-1177.

Unlike the Maryland statute invalidated in *Brookins*, § 1713(a) does not prohibit payment based on the content of an individual's speech. Instead, it prohibits the giving, solicitation or acceptance of a "payment or financial incentive" based on a particular *result* (*i.e.*, the procurement of a voter-registration application). 25 Pᴀ. Cᴏɴs. Sᴛᴀᴛ. § 1713(a). The application of the statutory provision is not dependent upon the content of a canvasser's speech. There is no indication that § 1713(a) was enacted for the purpose of suppressing a particular message or harming a specific class of speakers. The Attorney General contends that § 1713(a) was enacted in order to curb the submission of deficient voter-registration applications, eliminate an avenue for potential fraud, and bolster the integrity of the electoral process. Docket No. 71 at 13.

Although the Plaintiffs assert that those interests can be adequately protected without § 1713(a), they do not appear to argue that the statutory prohibition was enacted for some other purpose. Docket No. 76 at 18-23. Under these circumstances, § 1713(a) must be regarded as a content-neutral regulation. *Marcavage*, 609 F.3d at 279.

As the Supreme Court explained in *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), a court presented with a constitutional challenge to an election-related state statute must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate," identify "the precise interests put forward by the State as justifications for the burden imposed by its rule," evaluate "the legitimacy and strength of each of those interests," and determine "the extent to which those interests make it necessary [for the State] to burden the plaintiff's rights." Regulations imposing "severe burdens" on the exercise of First Amendment rights "must be narrowly tailored to advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (internal quotation marks omitted). The application of strict scrutiny to every conceivable voting regulation "would tie the hands of States seeking to ensure that elections are operated equitably and efficiently." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

In *Meyer*, the Supreme Court characterized Colorado's statute barring the use of paid circulators as "a limitation on political expression subject to exacting scrutiny." *Meyer*, 486 U.S. at 420. Given this level of scrutiny, the burden placed upon Colorado to justify the challenged statute was "well-nigh insurmountable." *Id.* at 425. The Colorado statute was subjected to strict

scrutiny because it imposed a "severe burden" on the exercise of First Amendment rights. *Buckley*, 525 U.S. at 192, n. 12. The critical question in this case is whether strict scrutiny should be applied to § 1713(a).

Some federal courts have assumed that, under *Meyer*, any statute purporting to restrict the manner in which canvassers or petition circulators can be paid must be subjected to strict scrutiny. *Idaho Coalition United for Bears v. Cenarrusa*, 234 F.Supp.2d 1159, 1165 (D.Idaho 2001); *Term Limits Leadership Council, Inc. v. Clark*, 984 F.Supp. 470, 473 (S.D.Miss. 1997); *LIMIT v. Maleng*, 874 F.Supp. 1138, 1140 (W.D.Wash. 1994). Other federal courts have determined that the level of scrutiny applicable to a regulation prohibiting the payment of canvassers or petition circulators on a per-signature basis depends upon the degree of the burden imposed on expressive activities entitled to First Amendment protection. *Deters*, 518 F.3d at 379-387; *Person v. New York State Board of Elections*, 467 F.3d 141, 143 (2d Cir. 2006);[10] *Prete v. Bradbury*, 438 F.3d 949, 961-968 (9th Cir. 2006); *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 616-618 (8th Cir. 2001); *On Our Terms '97 PAC v. Secretary of State*, 101 F.Supp.2d 19, 25-26 (D.Me. 1999); *Independence Institute v. Buescher*, 718 F.Supp.2d 1257, 1268-1274 (D.Colo. 2010). Although the Plaintiffs argue that § 1713(a) imposes a "severe" burden on their canvassing activities, they base their position on the idea that the statutory proscription sweeps broadly enough to prohibit the termination of unproductive employees. Docket No. 76 at 10-18. The Court has already determined that § 1713(a) should be construed

---

[10] In *Person v. New York State Board of Elections*, 467 F.3d 141, 143 (2d Cir. 2006), the United States Court of Appeals for the Second Circuit upheld a New York statute prohibiting canvassers who circulated nominating petitions on behalf of prospective candidates from being paid on a per-signature basis. Although the standard of review applied in that case was not specifically identified, it is apparent that the Court of Appeals applied a "balancing" test (rather than strict scrutiny) because the challenged statute did not significantly burden the plaintiffs' expressive activities. *Person*, 467 F.3d at 143 ("Person's argument that per-signature payment is, from a business perspective, the best incentive to campaign workers is insufficient to show any likelihood of success on his claim that this regulation imposes an unconstitutional burden on the exercise of his rights when balanced against the state's interest in preventing fraud in the gathering of signatures.").

more narrowly.  At the hearing, the Plaintiffs' counsel conceded that strict scrutiny would not be applicable in this case if § 1713(a) were to be interpreted to prohibit only "commission payments."  Docket No. 86 at 28-29.

The reasoning employed by the Supreme Court in *Buckley* suggests that the level of scrutiny applicable in a case such as this depends on the extent to which the relevant statutory provision burdens the expressive activities of the parties challenging its validity.  *Buckley*, 525 U.S. at 192 (applying strict scrutiny because the challenged statutory provisions "*significantly* inhibit[ed] communication with voters about proposed political change")(emphasis added); *Prete*, 438 F.3d at 962-963 (reading *Buckley* to account not only for the existence of a "decrease in the pool of available circulators" in determining the severity of the burden on expressive activities resulting from a statutory provision, but also for "the *degree* of the decrease")(emphasis in original).  The Plaintiffs have presented no evidence suggesting that § 1713(a), when construed to prohibit only "piece-rate" or commission payments, imposes a "severe" burden on their canvassing activities.  In a declaration dated April 11, 2011, Deckard stated that ACORN's hourly canvassers collected roughly 40,000 voter-registration applications in Allegheny County during the 2008 election season.  Docket No. 77-1 at 2, 4, ¶¶ 7-9, 23. Slater asserted in his declaration that Project Vote would like to utilize the "most effective" compensation system to motivate its canvassers to collect valid voter-registration applications from eligible individuals, and that a commission-payment system *may* prove to be more effective than an hourly-payment system.  Docket No. 77-1 at 8, ¶ 24.  Nevertheless, "bare assertions" of the kind made by Slater are not sufficient to subject § 1713(a) to strict scrutiny.  *Initiative & Referendum Institute*, 241 F.3d at 618.  Since the Plaintiffs concede that § 1713(a) (as construed by the Court) does not impose a "severe" burden on their election-related activities, the facial

validity of that statutory provision must be considered pursuant to a "less exacting" standard of review. *Timmons*, 520 U.S. at 358.

## E.    The Constitutionality of § 1713(a)

"A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434, quoting *Anderson*, 460 U.S. at 789. This "weighing process" is sufficiently flexible to account for both the interest of the State in regulating the electoral process and the First Amendment rights of individuals who seek to influence that process in a lawful manner. *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006). The Court must weigh all of these factors in order to determine whether § 1713(a) is facially constitutional. *Anderson*, 460 U.S. at 789.

### 1.    The Sources of Pennsylvania's Regulatory Authority

An initiative process like the one at issue in *Meyer* derives its source entirely from state law. *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1212 (10th Cir. 2002). A State's authority to regulate an initiative process of its own creation, or to regulate elections held to select its own government officials, is among the powers "reserved" to it under the Tenth Amendment. U.S. CONST., AMEND. X; *Oregon v. Mitchell*, 400 U.S. 112, 124-126, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970)(opinion of Black, J.). Where federal elections are involved, however, a State's regulatory authority springs directly from the United States Constitution. *Cook v. Gralike*, 531 U.S. 510, 522-523, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995). The Elections Clause

of the Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof," subject to the power of Congress to "make or alter such Regulations." U.S. CONST., ART. I, § 4. Article I, § 2, and the Seventeenth Amendment provide for the popular election of United States Representatives and Senators. U.S. CONST, ART. I, § 2; AMEND. XVII. These constitutional provisions further provide that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."[11] U.S. CONST., ART. I, § 2. Because the Constitution ties an individual's eligibility to vote for a United States Representative or Senator to his or her "qualification" to vote for a member of the state legislature, "the States are given the initial task of determining the qualifications of voters who will elect members of Congress." *Storer v. Brown*, 415 U.S. 724, 729-730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Pennsylvania's election laws apply equally to federal and state elections. *Kuznik v. Westmoreland County Board of Elections*, 902 A.2d 476, 490-493 (Pa. 2006). Therefore, the General Assembly's authority to enact legislation governing the registration of voters flows not only from the Pennsylvania Constitution, but also from the United States Constitution.

Article II, § 1, of the United States Constitution provides each State with the power to "appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. CONST., ART. I, § 2. The electors appointed by the States pursuant to this authority are charged with the duty of electing the President and Vice-President of the United

---

[11] The quoted language is contained in Article I, § 2, of the Constitution. U.S. CONST., ART. I, § 2. The Seventeenth Amendment contains language that is not materially different from that found in Article I, § 2. U.S. CONST., AMEND. XVII.

States in accordance with the procedures established by the Twelfth Amendment.[12] U.S. CONST., AMEND. XII. As the Supreme Court explained in *Bush v. Gore*, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)(*per curiam*), "[t]he individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the Electoral College." Having granted the electoral franchise to the people, a State remains free to take that power back at any time, and to appoint members of the Electoral College without holding a popular election. *Bush*, 531 U.S. at 104; *McPherson v. Blacker*, 146 U.S. 1, 34-35, 13 S.Ct. 3, 36 L.Ed. 869 (1892). Pennsylvania law provides for the popular election of Presidential electors. 25 PA. STAT. § 3191. The statutory provisions establishing voter-registration procedures are applicable to elections for Presidential electors.[13] *Kuznik*, 902 A.2d at 490 ("There are no provisions in our Election Code for separating the elections for federal offices from the elections for state and local offices."). Since Pennsylvania's voter-registration laws apply to elections for Presidential electors, they constitute an exercise of the State's power to prescribe the manner in which its Presidential electors are to be appointed. *Bush v. Palm Beach County Canvassing Board*, 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000)(*per curiam*).

2.      **The Impact of Pennsylvania's Regulatory Authority**

According to the Attorney General, the Constitution does not require Pennsylvania to permit entities such as ACORN and Project Vote to participate in the voter-registration process. Docket No. 71 at 16, n. 8. The Attorney General argues that since the Constitution delegates extensive authority to the States to regulate the electoral process, Pennsylvania could

---

[12] The District of Columbia is entitled to appoint Presidential electors pursuant to the Twenty-third Amendment. U.S. CONST., AMEND. XXIII.
[13] All of Pennsylvania's "qualified electors" are permitted to vote in elections for Presidential electors. 25 PA. STAT. § 3191.

constitutionally prohibit private voter-registration drives and require all prospective voters to complete their registration forms in the presence of a state official.[14]  Docket No. 86 at 44.  The crux of this argument is that Pennsylvania's prerogative to eliminate privately-run voter-registration drives necessarily includes the lesser power to regulate the manner in which private canvassers are paid for registering voters.  Docket No. 80 at 8-9.

A decision by a State to require every prospective voter to register in the presence of a state official would indirectly eliminate "the incidental political speech" that occurs in connection with voter-registration drives of the kind utilized by entities such as ACORN and Project Vote.  *American Association of People With Disabilities v. Herrera*, 580 F.Supp.2d 1195, 1214 (D.N.M. 2008).  It does not follow, however, that the greater power to dispense with privately-run voter-registration drives altogether (if such a power exists) includes the lesser power to impose financial disincentives on the expressive activities engaged in by those who participate in the voter-registration drives permitted under existing law.  In *Meyer*, the Supreme Court invalidated Colorado's ban on the use of paid circulators even though it was undisputed that Colorado had the constitutional authority to eliminate the initiative process entirely.  *Meyer*, 486 U.S. at 424-425.  The holding in *Meyer* was consistent with the understanding that "[i]f the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles."  *Republican Party of Minnesota v. White*, 536 U.S. 765, 788, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), quoting *Renne v. Geary*, 501 U.S. 312, 349, 111 S.Ct. 2331, 115 L.Ed.2d 288

---

[14] Even if the Constitution does not require the States to permit privately-run voter-registration drives, a reasonable argument could be made that the National Voter Registration Act of 1993 ("NVRA") [42 U.S.C. § 1973gg *et seq.*] requires that private entities be afforded an opportunity to register voters.  42 U.S.C. § 1973gg-4(b)(requiring the "chief State election official of a State" to make certain voter-registration forms "available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs"); *American Association of People With Disabilities v. Herrera*, 580 F.Supp.2d 1195, 1213, n. 5 (D.N.M. 2008)(suggesting that the NVRA may require each State to permit privately-run voter-registration drives).

(1991)(Marshall, J., dissenting). While this legal principle may not apply to the state-controlled electoral process in precisely the same way that it applies to the citizen-led initiative process, it retains its essential character even in areas in which broad state authority exists. *League of Women Voters v. Cobb*, 447 F.Supp.2d 1314, 1334-1339 (S.D.Fla. 2006)(relying on *Meyer* to invalidate a Florida statute imposing burdens on third parties participating in the voter-registration process without imposing similar burdens on political parties participating in the same process). Pennsylvania's extensive authority to regulate the voter-registration process does not remove the Plaintiffs' canvassing activities from the ambit of First Amendment protection. *Project Vote v. Blackwell*, 455 F.Supp.2d 694, 700 (N.D.Ohio 2006)(recognizing that the First Amendment protects the expressive activities associated with the voter-registration process). The regulatory authority of Pennsylvania "is not absolute." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008). The power of a State to regulate federal and state elections cannot be exercised in such a way as to violate specific provisions of the Constitution. *Williams v. Rhodes*, 393 U.S. 23, 29, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

3.     **The "Character and Magnitude" of the Burden on Canvassing Activities Resulting from § 1713(a)**

Although the distinction between the initiative process and the voter-registration process does not deprive the Plaintiffs' canvassing activities of constitutional protection, it does affect the "character and magnitude" of the burden that § 1713(a) places on those activities. *Timmons*, 520 U.S. at 358. In *Meyer*, the Supreme Court explained that the Colorado statute prohibiting the use of paid petition circulators restricted political expression in *two* ways. *Meyer*, 486 U.S. at 422-423. According to the Supreme Court, the prohibition implicated the First Amendment not

34

only because it decreased the number of circulators available to advocate the proposed political change, but also because it decreased the likelihood that the initiative proponents would secure enough signatures to place their proposal on the ballot, thereby "limiting their ability to make the matter the focus of statewide discussion." *Id.* The Attorney General correctly points out that the voter-registration process does not involve the second type of burden recognized in *Meyer*. Docket No. 80 at 8. The Plaintiffs (and similarly-situated actors) are not trying to obtain enough signatures to trigger a referendum or place a candidate's name on the ballot. Instead, they are trying to convince potential voters to make themselves eligible to vote for or against candidates who are already the subject of statewide (or nationwide) attention. Since individuals participating in a voter-registration drive do not have to procure a specific number of applications to facilitate a broader discussion, § 1713(a) has no impact on the second First Amendment interest identified in *Meyer*.[15] This factor distinguishes the instant case from cases involving challenges to statutes pertaining to the initiative process. *Deters*, 518 F.3d at 383 (remarking that "a per-time-only system" would "increase the costs of both proposing an initiative and qualifying it for the ballot"); *Independence Institute*, 718 F.Supp.2d at 1273 (finding a Colorado statute limiting the amount of a petition circulator's per-signature pay to 20% of his or her total compensation to be unconstitutional because the limitation would "make it more difficult, at least for some initiative proponents, to get their initiative[s] or referendum[s]

---

[15] Some groups involved in voter-registration drives may be determined to register enough voters in a given region to swing an election in favor of their preferred candidate. While the First Amendment protects the right of canvassers to campaign for or against particular candidates, it provides no assurance that prospective voters will be receptive to the messages espoused by canvassers. As the Supreme Court recently noted in *Nevada Commission on Ethics v. Carrigan*, ___U.S.___, ___, 131 S.Ct. 2343, 2351, 180 L.Ed.2d 150, 160 (2011), the First Amendment does not provide individuals with "a right to use governmental mechanics to convey a message." The fact that a regulation may make it less likely that a specific candidate will be *elected* (or *defeated*) on election day does not affect the constitutional analysis applicable under *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). The Colorado statute at issue in *Meyer* was constitutionally infirm not because it diminished the likelihood that the proposed initiative would *prevail* on election day, but rather because it decreased the chance that the proposal would qualify for the ballot in the first place. *Meyer*, 486 U.S. at 423. The constitutional interest recognized in *Meyer* is vindicated as soon as a proposal or candidate becomes "the focus of statewide discussion," regardless of the *results* yielded by that "discussion." *Id.*

on the ballot"); *On Our Terms '97 PAC*, 101 F.Supp.2d at 25-26 (relying on the difficulties encountered by initiative proponents in trying to qualify a proposal for the ballot as a basis for invalidating a Maine statute prohibiting the payment of petition circulators on a per-signature basis); *Term Limits Leadership Council*, 984 F.Supp. at 472-473 (invalidating a Mississippi statute prohibiting the payment of petition circulators on a per-signature basis because the law made it less likely that the plaintiffs would be able to "garner a sufficient number of signatures to place their initiative on the ballot").

Since § 1713(a) eliminates "one method of payment" that would otherwise be available to canvassers, it implicates the first constitutional interest discussed in *Meyer*. *Deters*, 518 F.3d at 384 (referring to evidence suggesting that "most professional coordinators and circulators [were] not interested in working under a per-time-only system"); *Prete*, 438 F.3d at 967 (observing that, "from an economic perspective, eliminating one method of payment . . . for petition circulators could result in some barriers to entry in the signature procurement market"); *Independence Institute*, 718 F.Supp.2d at 1273 (evaluating "uncontroverted" evidence indicating that "very few professional signature gatherers" were willing to "work in Colorado on an hourly basis"). To the extent that some canvassers would be willing to work for compensation provided on a "piece-rate" or commission basis but not for compensation provided on an hourly basis,[16] § 1713(a) "limits the number of voices" willing to convey the messages espoused by the Plaintiffs, thereby limiting "the size of the audience" that they can reach. *Meyer*, 486 U.S. at 422-423. Nevertheless, the record contains no evidence concerning the *number* of individuals deterred from working as canvassers because of § 1713(a). The *degree* to which the statutory prohibition

---

[16] By using the term "hourly basis" in this context, the Court does not mean to suggest that no other payment options are permissible under § 1713(a). *Prete v. Bradbury*, 438 F.3d 949, 952, n. 1 (9th Cir. 2006)(quoting an administrative rule issued by the Oregon Secretary of State listing different payment options under a similar statute). The Court uses the term "hourly basis" because ACORN paid its canvassers at an hourly rate during the 2008 election season. Docket No. 77-1 at ¶¶ 7-9.

deters canvassing activity is certainly relevant to the constitutional analysis in this case. *Buckley*, 525 U.S. at 193 ("Beyond question, Colorado's registration requirement *drastically* reduces the number of persons, both volunteer and paid, available to circulate petitions.")(emphasis added); *Prete*, 438 F.3d at 962-963 (reading *Buckley* to mean that "the *degree* of the decrease resulting from the [challenged] measure is properly considered in determining the severity of the burden" imposed on the exercise of expressive activities)(emphasis in original).[17]

In support of their position, the Plaintiffs have presented an expert report prepared by Dr. Denise M. Rousseau, who is a Professor of Organizational Behavior and Public Policy at Carnegie Mellon University. Docket No. 77-5 at 5-7. In her report, Dr. Rousseau opined that "piece-rate" compensation systems were "appropriate" for motivating voter-registration canvassers "to achieve both productivity and quality when used in conjunction with supportive management and organizational practices."[18] *Id.* at 7. Speaking about payment systems in a more general sense, Dr. Rousseau characterized "piece-rate" compensation systems as "problematic" in situations where "low piece rates" cause workers to "feel undercompensated." *Id.* She explained that the attainment of "both unit productivity and quality" under a "piece-rate" compensation system "requires training employees in the appropriate performance standards, supervisory oversight of quality, and equitable pay rates." *Id.* Dr. Rousseau stated that an employer's use of "[l]ow or inequitable piece rates" could lead to "both shoddy work and cheating" designed "to increase the production rate." *Id.*

---

[17] The Court has already determined that § 1713(a) does not impose a "severe" burden on the Plaintiffs' canvassing activities, and that strict scrutiny should not be applied in this case. These same factors relate to the "character and magnitude" of the burden that § 1713(a) places on those activities. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997).

[18] During the course of a deposition conducted on December 15, 2010, Dr. Rousseau acknowledged that she had not specifically researched how different forms of compensation may affect a canvasser's performance or productivity in the voter-registration context. Docket No. 73-6 at 7.

Dr. Rousseau's expert report contains no information suggesting that Project Vote would be able to recruit more canvassers if it could pay them on a "piece-rate" or commission basis. Her report speaks only to the issue of productivity, which comes into play only after a canvasser has already been recruited and hired.[19] *Id.* at 5-7. In his declaration, Slater merely stated that Project Vote "would want to be able to" pay its canvassers on a "commission" basis *if* such a compensation system were deemed to be "the most effective way to stimulate canvassers to collect valid [voter-registration] applications from eligible applicants." Docket No. 77-1 at 8, ¶ 24. Like Dr. Rousseau's report, Slater's statement relates only to the productivity of an existing canvasser. It sheds no light on the extent to which § 1713(a) decreases the number of individuals who are willing to engage in canvassing activities on behalf of Project Vote. During the 2008 election season, ACORN employed 1,225 canvassers in Pennsylvania, 439 of whom were working in Allegheny County. Docket No. 73-6 at 22. Nothing in the record suggests that ACORN would have been able to employ more canvassers if it had been able to pay them based on the number of voter-registration applications procured.

There is language in *Meyer* suggesting that the First Amendment protects the right of individuals "to select what they believe to be the most effective means" to convey their message. *Meyer*, 486 U.S. at 424. This language, however, must be read in context. The Colorado statute prohibiting the use of paid petition circulators had the "inevitable effect" of restricting "direct one-on-one communication," which the Supreme Court characterized as "the most effective, fundamental, and perhaps economical avenue of political discourse." *Id.* at 423-424. The reasoning employed in *Meyer* does not support the idea that Project Vote has an unqualified First

---

[19] The Plaintiffs appear to have presented Dr. Rousseau's expert report in order to demonstrate that they could not effectively conduct a paid voter-registration drive without holding hourly canvassers to production-based expectations. Docket No. 77-5 at 5-7. That issue is not germane to the constitutional inquiry, since the Court has determined that § 1713(a) does not prohibit entities like ACORN and Project Vote from terminating canvassers who fail to secure a specific number of voter-registration applications.

Amendment right to choose the compensation system that it believes to be "the most effective way" to motivate its canvassers. Docket No. 77-1 at 8, ¶ 24. The problem with the Colorado statute challenged in *Meyer* was that it completely foreclosed an entire "channel of communication." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 398, n. 1, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000)(Stevens, J., concurring). It was that "channel of communication" (*i.e.*, "direct one-on-one communication") that was deemed to be "the most effective means" available to initiative proponents to express their message. *Meyer*, 486 U.S. at 424. Unlike the statute at issue in *Meyer*, § 1713(a) does not have the "inevitable effect" of preventing the Plaintiffs from engaging in "direct one-on-one communication." *Id.* at 423-424. After all, ACORN was able to collect roughly 40,000 voter-registration applications in Allegheny County during the 2008 election season. Docket No. 77-1 at 7, ¶ 15. The record indicates that, throughout all of Pennsylvania, ACORN procured 127,156 voter-registration applications in 2008. Docket No. 73-6 at 21-22.

The records developed in some of the cases relied upon by the Plaintiffs indicate that entities employing professional petition circulators are reluctant to support petition drives in States where per-signature payments are prohibited. *Deters*, 518 F.3d at 383-385; *Independence Institute*, 718 F.Supp.2d at 1273-1274. As noted earlier, however, the voter-registration context is materially different from the initiative context.[20] An entity or individual circulating an initiative petition must procure a specific number of signatures in order to place a given proposal on the ballot. *Meyer*, 486 U.S. at 423. Similarly, an entity or individual circulating a nominating petition must secure a specific number of signatures in order to place a political candidate's name on the ballot. 25 PA. STAT. § 2872.1. Voter-registration canvassers do not operate under a

---

[20] Although the Ohio statute invalidated in *Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008), applied to both initiative petitions and voter-registration applications, the evidence discussed by the United States Court of Appeals for the Sixth Circuit related primarily to initiative petitions. *Deters*, 518 F.3d at 377-385.

similar constraint. Furthermore, a "piece-rate" or commission payment system may prove to be more profitable for a petition circulator than it would be for a voter-registration canvasser. An individual who is already registered to vote (and who does not wish to change his or her party affiliation) will ordinarily be *able* to sign an electoral petition and *unable* to sign a voter-registration application. In jurisdictions where only registered voters are eligible to sign initiative and nominating petitions, an unregistered individual will be *able* to sign a voter-registration application and *unable* to sign a petition. While both petition circulators and voter-registration canvassers regularly engage in expressive activities entitled to First Amendment protection, their respective messages are not directed at the same audience. The Court cannot assume that "legislative facts" recognized in cases involving the initiative process have the same import in the voter-registration context.[21]

The Plaintiffs have presented no evidence suggesting that § 1713(a) (as construed by the Court) decreases "the number of voices" available to convey their message. *Meyer*, 486 U.S. at 422. They have not demonstrated that the statutory prohibition "restricts the overall quantum of speech" uttered by voter-registration canvassers. *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000). As far as the Court can tell, the burden on the Plaintiffs' expressive activities

---

[21] Federal Rule of Evidence 201, which identifies the circumstances in which a federal court may take judicial notice of matters extrinsic to the record of a case, "governs only judicial notice of *adjudicative* facts." FED. R. EVID. 201(a)(emphasis added). Adjudicative facts concern "the parties and events of a particular case." *Moore v. Moore*, 376 A.2d 1085, 1086 (Conn. 1978). In contrast, "legislative facts" concern information relating to the content of the law. *O'Hanlon v. Hartford Accident & Indemnity Co.*, 457 F.Supp.2d 961, 962 (D.Del. 1978). Unlike adjudicative facts, which are ordinarily established by reference to the case record, legislative facts include "material set forth in the briefs" filed by the parties. *Daggett v. Commission on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999). The distinction between adjudicative facts and legislative facts is not always easy to identify. Nonetheless, the relief sought by the Plaintiffs (*i.e.*, the facial invalidation of § 1713(a)) reaches "beyond the particular circumstances" of this case. *Doe v. Reed*, ___U.S.___, ___, 130 S.Ct. 2811, 2817, 177 L.Ed.2d 493 (2010). The constitutionality of § 1713(a) ultimately turns on whether the statute "abridg[es] the freedom of speech" within the meaning of the First Amendment. U.S. CONST., AMEND. I. Therefore, the Court's factual inquiry can extend beyond the evidence presented by the parties. *Washington v. Balzer*, 954 P.2d 931, 938 (Wash.Ct.App. 1998)(citing Rule 201(a) for the proposition that "courts have unrestricted ability to employ judicially noticed 'legislative facts' in formulating legal principles").

resulting from the application of § 1713(a) is *de minimis*. *Initiative & Referendum Institute*, 241 F.3d at 618.

### 4. The Interests Identified by Pennsylvania to Justify the Burden Resulting from § 1713(a)

The Attorney General maintains that § 1713(a) furthers Pennsylvania's interests in conducting an orderly and efficient electoral process, deterring the submission of fraudulent voter-registration applications, and eliminating an avenue of potential fraud at the time of balloting. Docket No. 71 at 13. She contends that § 1713(a) eliminates an economic incentive for canvassers to submit fraudulent voter-registration applications. *Id.* at 13-17. The "legitimacy and strength" of these interests can only be understood in relation to the overall context of Pennsylvania's voter-registration process. *Anderson*, 460 U.S. at 789.

Pennsylvania maintains a Statewide Uniform Registry of Electors ("SURE") listing the names of all registered voters and their respective "election districts" of residence.[22] 25 PA. CONS. STAT. § 1222(a), (b)(1), (15). The SURE database is administered by the Pennsylvania Department of State ("Department"). Docket Nos. 72 & 82 at ¶ 12. The Department does not have the authority to independently process voter-registration applications. *Id.* The applications are processed by election officials serving throughout Pennsylvania's sixty-seven counties. *Id.* The SURE database makes it easier for county election officials to obtain and verify information relating to the voter-registration process, share information with other governmental agencies, identify duplicate voter registrations, or transfer an individual's voter registration to another county. *Id.* In accordance with Pennsylvania's general policy of encouraging all eligible citizens

---

[22] The Help America Vote Act of 2002 ("HAVA") [42 U.S.C. § 15301 *et seq.*] requires "each State . . . [to] implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every registered voter in the State and assigns a unique identifier to each legally registered voter in the State . . . ." 42 U.S.C. § 15483(a).

to vote, the Department provides groups seeking to register voters with the necessary voter-registration materials. *Id.* at ¶ 15.

The Help America Vote Act of 2002 ("HAVA") [42 U.S.C. § 15301 *et seq.*] requires each new voter-registration application to include either the applicant's driver's license number or the last four digits of his or her social security number.[23]  42 U.S.C. § 15483(a)(5)(A)(i).  This statutory requirement makes it easier for county election officials to utilize the SURE database for the purpose of flagging duplicate or invalid applications.  Docket Nos. 72 & 82 at ¶ 18. When discrepancies are found, however, election officials remain obligated to register individuals who meet the applicable eligibility requirements. *Id.* at ¶ 19.  Pennsylvania considers all voter-registration applications to be presumptively valid. *Id.* at ¶ 22.  An applicant may still be registered to vote even if an election official is on notice that a discrepancy exists with respect to the applicant's driver's license number, social security number or district of residence. *Id.* at ¶ 19.  When a discrepancy is found, further inquiries concerning the applicant's eligibility to register must ensue. *Id.*  In some instances, it is determined that an applicant or election official has accidentally inverted digits within the applicant's driver's license or social security number. *Id.*

Under Pennsylvania law, an individual "who appears to vote in [an] election district for the first time and who desires to vote" must present a form of "photo identification" that complies with the applicable statutory requirements before completing his or her ballot.  25 PA. STAT. § 3050(a).  Where such a "photo identification" is unavailable, a first-time voter can satisfy the statutory requirements by providing an alternative form of identification.  25 PA. STAT. § 3050(a.1).  An individual who is unable to produce a form of identification conforming

---

[23] The relevant provisions of the HAVA apply only to federal elections.  42 U.S.C. § 15483(a)(5)(A).  As noted earlier, however, Pennsylvania's election laws apply equally to federal and state elections. *Kuznik v. Westmoreland County Board of Elections*, 902 A.2d 476, 490-493 (Pa. 2006).

to the statutory mandate can complete only a provisional ballot, the votes on which will be counted only if it is later determined that he or she was properly registered to vote on the date of the election. 25 PA. STAT. § 3050(a.2), (a.4). These statutory requirements are consistent with the federal mandates established by the HAVA. 42 U.S.C. §§ 15482(a), 15483(b)(1)-(3).

Diane Boscia ("Boscia") has served as Allegheny County's Manager of Voter Registration since 2007. Docket No. 73-5 at 14. During the course of a deposition conducted on September 29, 2010, Boscia testified that the statutory identification requirements applicable to first-time voters would most likely prevent voter-registration fraud from having a direct impact on the results of an election. *Id.* at 45-47. Jonathan Marks ("Marks"), the Chief of the Department's SURE Division, declared on April 1, 2011, that the identification requirements made it "highly unlikely that an individual could register and be allowed to vote in two different precincts, or under a false or assumed name." Docket No. 73-4 at 55, ¶ 14. The unlikelihood of voter fraud does not completely eliminate Pennsylvania's interest in ensuring legitimate electoral outcomes, since there is always a chance that an election official will neglect to enforce the applicable statutory requirements and unknowingly permit a fraudulent vote to be cast. Nevertheless, the availability of these safeguards to protect the integrity of Pennsylvania's electoral system clearly factors into the constitutional analysis in this case. *Buckley*, 525 U.S. at 205 (explaining that the "arsenal of safeguards" retained by Colorado to protect the integrity of its initiative process made more burdensome measures unnecessary).

The legitimacy of electoral *results*, however, is not the only regulatory interest at stake. *Doe v. Reed*, ___U.S.___, ___, 130 S.Ct. 2811, 2819, 177 L.Ed.2d 493 (2010)(recognizing that fraud can have a negative "systemic effect" extending beyond the production of "fraudulent outcomes"). The Attorney General argues that county election officials must devote a

considerable amount of time and resources to maintain an orderly voter-registration process when inaccurate, deficient or fraudulent applications are submitted. Docket No. 71 at 13. She contends that § 1713(a) facilitates the orderly administration of the voter-registration process by eliminating financial incentives for canvassers to submit fraudulent applications. *Id.*

Between December 1, 2007, and December 31, 2009, election officials throughout Pennsylvania received 1,347,174 new voter-registration applications. Docket Nos. 72 & 82 at ¶ 11. During that same period of time, 3,272,500 previously-registered voters submitted application forms in order to change information related to their registration status. *Id.* Approximately 883,000 individuals are presently registered to vote in Allegheny County. *Id.* at ¶ 25. According to Mark Wolosik ("Wolosik"), who serves as the Manager of the Elections Division, approximately $800,000.00 of the Elections Division's annual $5.1 million budget is allocated to voter-registration activities.[24] Docket No. 72 at ¶ 2. Roughly one-third of the Elections Division's thirty-eight full-time employees focus on voter-registration procedures. *Id.* Boscia testified that the Elections Division frequently hires temporary employees during election seasons, when the number of voter-registration applications typically increases. Docket No. 73-5 at 20-22. She stated that temporary employees were most often needed in Presidential election years, and that the Elections Division had hired ten to twelve temporary employees during the fall of 2008. *Id.* at 22.

When questioned about voter-registration policies in Allegheny County, Boscia explained that canvassers are required to submit all applications that they obtain to the Elections Division, even if they believe some of the applications to be fraudulent. *Id.* at 53. This policy is designed to ensure that each individual who legitimately attempts to register is afforded the opportunity to

---

[24] The record contains an article prepared by the Pew Center on the States explaining that Oregon incurred $8.8 million in voter-registration costs during the 2008 election season. Docket No. 73-9 at 1.

do so.  *Id.*  A canvasser working in Allegheny County has the option of refusing to accept an application that he or she believes to be fraudulent, but the Elections Division's policy requires canvassers to submit all applications accepted from prospective voters, irrespective of whether they are thought to be valid.  *Id.* at 54.  Boscia testified that it was the job of Elections Division personnel to determine the validity of all voter-registration applications accepted by canvassers. *Id.*  In his declaration, Marks stated that fraudulent voter-registration applications create additional work for county election officials.  Docket No. 73-4 at ¶ 13.  According to Marks, such applications often require county election officials to make telephone calls and send letters inquiring about information relevant to the voter-registration process.  *Id.*

The Plaintiffs do not appear to dispute that fraudulent voter-registration applications place a significant burden on county election officials.  Instead, they argue that Pennsylvania has no evidence suggesting that "piece-rate" or commission payments result in the submission of fraudulent applications.  Docket No. 76 at 23.  In support of their position, the Plaintiffs rely on *Independence Institute v. Buescher*, 718 F.Supp.2d 1257, 1277 (D.Colo. 2010), in which the United States District Court for the District of Colorado observed that a State attempting to defend a ban on per-signature payments in the initiative context must provide some form of "verification" to justify its contention that such payments actually encourage or result in fraudulent activity.[25]  *Id.* at 22-23.  The Attorney General candidly acknowledges that she has no historical evidence from Pennsylvania indicating that "piece-rate" or commission payments prompt canvassers to submit fraudulent voter-registration applications.  Docket No. 77-1 at 19. The Plaintiffs contend that this admission essentially requires the invalidation of § 1713(a).

---

[25] It is worth noting that the language in *Independence Institute v. Buescher*, 718 F.Supp.2d 1257, 1277 (D.Colo. 2010) relied upon by the Plaintiffs was dictum.

The problem with the Plaintiffs' argument is that it ignores the distinction between "adjudicative facts" and "legislative facts." Federal Rule of Evidence 201, which controls the circumstances in which a federal court can take judicial notice of facts extrinsic to the record, "governs only judicial notice of *adjudicative* facts." FED. R. EVID. 201(a)(emphasis added). Unlike adjudicative facts, which concern the particular parties before the Court, legislative facts relate to the content of the law itself. *O'Hanlon v. Hartford Accident & Indemnity Co.*, 457 F.Supp. 961, 962 (D.Del. 1978). The Court is free to look beyond the record in order to determine whether § 1713(a) facially "abridg[es] the freedom of speech" within the meaning of the First Amendment. *Washington v. Balzer*, 954 P.2d 931, 938 (Wash.Ct.App. 1998)(citing Rule 201(a) for the proposition that "courts have unrestricted ability to employ judicially noticed 'legislative facts' in formulating legal principles"). A facial challenge, by its very nature, implicates the constitutional rights of "[s]ociety as a whole" rather than simply the rights of the particular parties before the Court. *Secretary of State v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). "[T]he justification for a statute" is typically proven by reference to "material set forth in the briefs filed by the parties" rather than by reference to the evidentiary record developed in a particular case. *Daggett v. Commission of Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999). While case-specific evidence may often be used to buttress a State's assertion that its law is genuinely necessary to secure a particular interest, a valid legislative enactment is not rendered facially invalid *because* a State fails to make such an evidentiary showing. *Nixon*, 528 U.S. at 391 ("The state statute is not void, however, *for want of evidence*.")(emphasis added).

In various First Amendment contexts, the Supreme Court has recognized that one State can look to the experiences of other States in determining what measures are necessary to protect

its interests.  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555, 121 S.Ct. 2404, 150 L.Ed.2d

532 (2001); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d

541 (1995); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52, 106 S.Ct. 925, 89

L.Ed.2d 29 (1986).  In some instances, it is sufficient for a State to rely on a judicial opinion

describing the evidentiary justification for a law.[26]  *City of Erie v. Pap's A.M.*, 529 U.S. 277,

297, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000).  "The quantum of empirical evidence needed to

satisfy heightened judicial scrutiny of legislative judgments" is something that "var[ies] up or

down with the novelty and plausibility of the justification raised."  *Nixon*, 528 U.S. at 391.  Even

the demanding standard of strict scrutiny (which is not applicable in this case) can sometimes be

satisfied by reference to "[a] long history, a substantial consensus, and simple common sense."

*Burson v. Freeman*, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992).

The fact that per-signature payments create incentives for petition circulators to commit

fraud has been recognized by three Courts of Appeals in decisions sustaining state statutes

prohibiting the use of "piece-rate" and commission-based compensation systems in the initiative

and candidate-nomination contexts.  *Person*, 467 F.3d at 143; *Prete*, 438 F.3d at 969-971;

*Initiative & Referendum Institute*, 241 F.3d at 617-618.  The Commission on Federal Election

Reform ("Commission"), which was co-chaired by former President James E. Carter and former

Secretary of State James A. Baker, III, issued a report in September 2005 making specific

reference to instances of voter-registration fraud perpetrated "by individuals who were paid by

the piece to register voters."  Docket No. 73-7 at 55.  The Supreme Court has cited the

Commission's report for the proposition that each State "has a valid interest in participating in a

*nationwide* effort to improve and modernize election procedures that have been criticized as

---

[26] At the hearing, the Deputy Attorney General specifically asked the Court to consider the decisions upholding bans on "piece-rate" and commission-based payment systems in the initiative and candidate-nomination contexts.  Docket No. 86 at 86.

antiquated and inefficient." *Crawford v. Marion County Election Board*, 553 U.S. 181, 191, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008)(emphasis added). The nationwide reach of the Commission's report highlights the fact that the experiences of other jurisdictions are relevant to the constitutional analysis in this case.[27]

The Plaintiffs' own expert, Dr. Rousseau, acknowledged that when "piece-rate" and commission-based compensation systems are "used without appropriate supports, quality can decline as unit productivity goes up." Docket No. 77-5 at 7. She stated that, in the voter-registration context, "piece-rate" and commission-based compensation systems can increase "both productivity and quality *when used in conjunction with supportive management and organizational practices*." *Id.* (emphasis added). As Marks pointed out in his declaration, the Department cannot be expected to monitor groups participating in voter-registration drives in order to ensure that they take the steps necessary to prevent individual canvassers from engaging in fraudulent activity. Docket No. 73-4 at ¶¶ 7-8. Dr. Rousseau's expert report, when viewed in relation to the statements contained in the Commission's report and the three Courts of Appeals decisions sustaining statutes prohibiting per-signature payments, confirms that the anti-fraud interests relied upon by Pennsylvania "are real" and "not merely conjectural." *Turner Broadcasting System*, 512 U.S. at 664.

### 5. The Weighing of Interests

When the operation of a State's law "severely" burdens expressive activities entitled to constitutional protection, the burden that the State "must overcome to justify [its] law is well-nigh insurmountable." *Meyer*, 486 U.S. at 425. In every case in which a ban on per-signature payments has been subjected to strict scrutiny, the applicable statutory provision has been

---

[27] The unavailability of legislative history describing the General Assembly's reasons for enacting § 1713(a) is of no dispositive significance. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567-568, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991)(plurality opinion).

invalidated. *Deters*, 518 F.3d at 385-388; *Independence Institute*, 718 F.Supp.2d at 1270-1278; *Idaho Coalition United for Bears*, 234 F.Supp.2d at 1165-1166; *On Our Terms '97 PAC*, 101 F.Supp.2d at 25-26; *Term Limits Leadership Council*, 984 F.Supp. at 473-475; *LIMIT*, 874 F.Supp. at 1140-1141. When a "less exacting" standard of review applies, however, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358 (internal quotation marks omitted). In every case in which a ban on per-signature payments has been subjected to a "less exacting" level of judicial scrutiny, the challenged legislative enactment has been upheld.[28] *Person*, 467 F.3d at 143; *Prete*, 438 F.3d at 963-971; *Initiative & Referendum Institute*, 241 F.3d at 617-618.

In this case, the Plaintiffs concede that § 1713(a) (as construed by the Court) does not impose a "severe" burden on their canvassing activities, and that it should not be subjected to strict scrutiny. Docket No. 86 at 28-29. Under these circumstances, the interests asserted by Pennsylvania in defense of § 1713(a) need only be "sufficiently weighty to justify the limitation" imposed on canvassing activities. *Norman v. Reed*, 502 U.S. 279, 288-289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992). Because § 1713(a) imposes only a minimal burden on the Plaintiffs' expressive activities, Pennsylvania's interest in preventing voter-registration fraud is sufficient to defeat the Plaintiffs' facial challenge.[29] *Person*, 467 F.3d at 143 ("Person's argument that per-signature payment is, from a business perspective, the best incentive to campaign workers is insufficient to show any likelihood of success on his claim that this regulation imposes an

---

[28] A statute does not run afoul of the First Amendment simply because it prohibits a specific method of payment for highly-protected expressive activities. Although lobbying activities enjoy a high degree of constitutional protection, courts have recognized the constitutional validity of legislative enactments prohibiting lobbyists from being paid on a contingency-fee basis. *Florida League of Professional Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 458-462 (11th Cir. 1996); *Roa v. Lodi Medical Group, Inc.*, 695 P.2d 164, 167, n. 5 (Cal. 1985).

[29] Pennsylvania has other ways to prevent voter-registration fraud. 25 PA. CONS. STAT. § 1714. Nevertheless, the statutory provisions directly prohibiting fraudulent activities do not necessarily deter canvassers from submitting fraudulent applications. In his declaration, Wolosik stated that Allegheny County election officials had received "hundreds" of fraudulent applications in 2008. Docket No. 73-5 at ¶ 7.

unconstitutional burden on the exercise of his rights when balanced against the state's interest in preventing fraud in the gathering of signatures."). In *Munro v. Socialist Workers Party*, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986), the Supreme Court made the following observations:

> To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove the predicate. Such a requirement would necessitate a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.

*Munro*, 479 U.S. at 195-196. Although the voter-registration context differs somewhat from the ballot-access context, the overriding principle recognized in *Munro* is squarely applicable to this case. Given that § 1713(a) does not "significantly impinge" on the Plaintiffs' First Amendment rights, the Court has no basis for requiring Pennsylvania to come forward with jurisdiction-specific evidence to justify its law.[30] *Id.*

Under § 1713(a), the Plaintiffs remain free to conduct paid voter-registration drives, to hold hourly employees to production-based expectations, and to terminate canvassers who fail to meet those expectations. They are also free to award bonuses based on factors such as reliability and longevity. *Prete*, 438 F.3d at 952, n. 1. Furthermore, the Plaintiffs can pay a canvasser based on the number of contacts that he or she has with prospective voters without tying his or her level of compensation to the number of voter-registration applications resulting from those contacts. Docket No. 86 at 68. In this respect, § 1713(a) does not prohibit the Plaintiffs from

---

[30] Section 1713(a) does not restrict "pure speech." *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 345, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Instead, it prohibits only one form of payment for activities involving the voter-registration process. 25 PA. CONS. STAT. § 1713(a). In this respect, the challenged statutory provision is closer in character to ballot-access restrictions than it is to "regulations directed at intangible influence." *Burson v. Freeman*, 504 U.S. 191, 209, n. 11, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)(internal quotation marks omitted).

tying the rate of a canvasser's pay to the "overall quantum" of his or her speech. *Campbell*, 203

F.3d at 745. At the hearing, the Deputy Attorney General posited that § 1713(a) would not

prevent an entity such as Project Vote from prospectively increasing the rate of a canvasser's pay

based on the number of applications procured during the course of a prior shift. Docket No. 86

at 46, 67. It is not clear whether such a prospective pay adjustment would run afoul of § 1713(a).

The Court need not resolve that question, since the Plaintiffs' facial challenge could not succeed

even if it is assumed that § 1713(a) prohibits the provision of production-based bonuses, and that

the statutory prohibition could not be constitutionally applied in that context. "[W]here conduct

and not merely speech is involved," a party mounting a facial challenge to a statute must

demonstrate that the overbreadth of the statute is not only real, "but substantial as well, judged in

relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. Although some

of § 1713(a)'s applications may be unconstitutional, the degree of overbreadth is not

"substantial" enough to justify an order prohibiting Pennsylvania "from enforcing the statute

against conduct that is admittedly within its power to proscribe." *Id.*

In light of the fact that § 1713(a) (as construed by the Court) places only "modest

burdens" on the Plaintiffs' canvassing activities, the Plaintiffs' facial challenge to the statutory

prohibition cannot succeed. *Doe*, 130 S.Ct. at 2821. The parties should keep in mind, however,

that this decision "upholding the law against a broad-based challenge does not foreclose a

litigant's success in a narrower one." *Id.* At this time, it suffices to say that § 1713(a) is not

unconstitutional on its face. *Washington State Grange*, 552 U.S. at 457-458.

## F.     The Unavailability of Prospective Relief

"[T]he federal courts established pursuant to Article III of the Constitution do not render

advisory opinions." *United Public Workers v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed.

754 (1947).  Under the precise circumstances of this case, however, the Court had "to construe

the challenged statute" in order to determine whether it was facially constitutional.  *Williams*,

553 U.S. at 293.  By construing § 1713(a) narrowly enough to preserve its facial

constitutionality, the Court effectively determined that the statutory prohibition does not

proscribe conduct of the kind described in the affidavit of probable cause relating to Givner.[31]

Docket No. 77-1 at 28 ("GIVNER stated that she was hired by ACORN in June of 2008 and was

fire [sic] three weeks later because she could not reach the assigned quota of 22 applications a

day.").[32]  The distinction between facial and as-applied challenges relates primarily to the

*remedy* sought by a plaintiff or employed by a court.[33]  *Doe*, 130 S.Ct. at 2817; *Citizens United*,

130 S.Ct. at 893.  Therefore, the dispositive question is whether the District Attorney's

invocation of § 1713(a) to prohibit constitutionally-protected conduct entitles the Plaintiffs to

injunctive or declaratory relief.

    In order to obtain injunctive relief against the Attorney General based on the District

Attorney's reading of § 1713(a), the Plaintiffs must demonstrate that the Attorney General is

likely to apply the statutory prohibition in the same manner as the District Attorney.  *Mayor of*

---

[31] This observation concerns only the charges brought against Givner (and her colleagues) under § 1713(a).  The Court has no occasion to consider matters relating to the other charges filed against the former ACORN canvassers.

[32] The evidentiary record contains several newspaper articles published by the *Pittsburgh Post-Gazette* and the *Pittsburgh Tribune-Review*.  Docket No. 77-2.  These articles all relate to the charges brought against former ACORN canvassers by the District Attorney.  An article published by the *Pittsburgh Post-Gazette* on May 8, 2009, suggested that, according to the District Attorney, the canvassers had been told that "they needed to meet a daily quota *to be paid* their hourly wage of $8."  *Id.* at 1 (emphasis added).  A decision by an employing entity to condition *payment* (rather than *continued employment*) on a canvasser's procurement of a specific number of voter-registration applications would appear to be in violation of § 1713(a).  The affidavit of probable cause, however, contained no information indicating that ACORN had conditioned Givner's *payment* on her procurement of twenty-two applications during the course of a shift.  Docket No. 77-1 at 28.

[33] A typical as-applied challenge to a statutory provision involves a claim that conduct clearly falling within the provision's proscriptive purview is nevertheless entitled to constitutional protection.  *Wisconsin v. Yoder*, 406 U.S. 205, 234-236, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).  The as-applied challenge brought by the Plaintiffs in this case is different because it relates to conduct that is not prohibited under § 1713(a) in the first place.  The relief sought by the Plaintiffs is targeted at the District Attorney's *ultra vires* application of the statute rather than at the reach of the statute itself.  In this respect, the Plaintiffs' more limited challenge is not necessarily a true "as-applied" challenge to § 1713(a).  Any mislabeling of the Plaintiffs' challenge, however, is of no dispositive significance.  *Doe v. Reed*, ___U.S.___, ___, 130 S.Ct. 2811, 2817, 177 L.Ed.2d 493 (2010)("The label is not what matters.").

*Philadelphia v. Educational Equality League*, 415 U.S. 605, 622-623, 94 S.Ct. 1323, 39 L.Ed.2d

630 (1974); *Spomer v. Littleton*, 414 U.S. 514, 520-523, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974);

*Sarteschi v. Burlein*, 508 F.2d 110, 114 (3d Cir. 1975); *Lewis v. Delaware Dept. of Public

Instruction*, 986 F.Supp. 848, 854 (D.Del. 1997).  The Attorney General maintains that § 1713(a)

does not prohibit entities such as Project Vote from holding hourly canvassers to production-

based expectations.  Docket No. 86 at 46.  She contends that a canvasser may be lawfully

discharged for failing to procure a specific number of voter-registration applications during the

course of a single shift.  *Id.* at 66-67.  She further concedes that § 1713(a) would be

unconstitutional if it were to be construed broadly enough to prohibit an employing entity from

terminating its canvassers under such circumstances.  *Id.* at 47, 85.  In light of these unequivocal

representations by the Attorney General, there is no reasonable likelihood that she will prosecute

the Plaintiffs under § 1713(a) for holding canvassers to production-based expectations and

terminating unproductive employees.[34]  *Presbytery of New Jersey of the Orthodox Presbyterian

Church*, 40 F.3d at 1465-1470.  Consequently, the Plaintiffs are not entitled to an order enjoining

the Attorney General from employing § 1713(a) in an unconstitutional manner.

Declaratory relief[35] is available only where "there is a substantial controversy, *between

parties* having adverse legal interests, of sufficient immediacy and reality to warrant the issuance

of a declaratory judgment."  *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270,

273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)(emphasis added).  In this vein, "[t]he availability of

declaratory relief depends on whether there is a live dispute *between the parties*."  *Powell v.*

[34] The Plaintiffs' reliance on *The Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000) is unavailing.  Docket No. 83 at 7-8.  That decision contains no language suggesting that the Attorney General, who has affirmatively rejected the broad reading of § 1713(a) posited by the District Attorney, can be enjoined from enforcing the statute against conduct that she does not believe to be prohibited thereunder in the first place.  *The Pitt News*, 215 F.3d at 359-367.

[35] The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

*McCormack*, 395 U.S. 486, 517-518, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)(emphasis added).

Because ACORN voluntarily agreed to the District Attorney's dismissal as a defendant, the

District Attorney is no longer a *party* to this case. Docket Nos. 18 & 19. For this reason, the

Plaintiffs are not entitled to declaratory relief based on the alleged violations of the First and

Fourteenth Amendments stemming from the District Attorney's *ultra vires* application of §

1713(a). *Pittsburgh Mack Sales & Service, Inc. v. International Union of Operating Engineers*,

580 F.3d 185, 190 (3d Cir. 2009)(identifying the "adversity of the interest of the parties" as a

factor relevant to the availability or unavailability of declaratory relief).

**V.      Conclusion**

        The facial invalidation of a statutory provision constitutes "strong medicine" that should

be "employed by the Court sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613.

When properly construed, § 1713(a) does not significantly burden the canvassing activities

engaged in by the Plaintiffs and similarly-situated parties. Pennsylvania's regulatory interests,

when viewed in relation to the minimal burdens placed on expressive activities by § 1713(a), are

"sufficiently weighty to justify" the challenged statutory prohibition. *Norman*, 502 U.S. at 288-

289. Accordingly, the Court will grant the motion for summary judgment filed by the Attorney

General (*Docket No. 70*) and deny the motion for summary judgment filed by the Plaintiffs

(*Docket No. 74*). An appropriate order follows.


                                                *s/Nora Barry Fischer*
                                                Nora Barry Fischer
                                                United States District Judge


Date:    July 27, 2011

cc:      All counsel of record